## In re TOMPKINS BUS CORPORATION.
### No. 33009.

District Court, E. D. New York.

Feb. 21, 1938.

Hartman, Levy & Hartman, of New York City, for petitioner.

Edwin M. Slote, of New York City, for trustee.

BYERS, District Judge.

By this motion, the claimant in reclamation proceedings seeks to review the order of the referee in bankruptcy dated January 7, 1938, by which the petition of the B. F. Goodrich Company to reclaim 348 tires and tubes attached to 58 Yellow buses, formerly operated by the bankrupt, was dismissed and the said articles were awarded to the trustee as being the property of the bankrupt.

The matter for decision is the interpretation and construction of an agreement bearing date July 28, 1933, between the bankrupt and the B. F. Goodrich Rubber Company as supplemented September 7, 1933, and December 12, 1933.

Those contracts are in evidence and therefore need not be recited at length.

The first describes the petitioner as Supplier and the bankrupt as Operator, and provides that the buses of the latter shall be equipped with tires manufactured by the Supplier, who shall maintain and repair all tires and their various parts and will dismount tires from rims or discs. That provision has to do with so-called "full-servicing."

Paragraph 3 provides that all tires and equipment "shall at all times remain the property of Supplier, and Operator will take all necessary steps to protect and maintain Supplier's title * * * free and clear from all encumbrances of all persons whomsoever. Any tax, excise or levy, of whatsoever kind or form, imposed or assessed

directly or indirectly by Governmental authority upon the sale and/or manufacture of the tires furnished by Supplier, under this agreement or by reason of the posses-. sion and use by Operator of goods or service covered by this agreement and any increase in the manufacturing or selling cost directly or indirectly resulting from or imposed by any law or laws now in effect or hereafter imposed shall be assumed by Operator and paid to Supplier or as Supplier may direct."

Then follows a provision whereby the Operator agrees to pay for lost, stolen, or destroyed casings or such as may be damaged by fire, "at Goodrich List Prices then in effect, less the amount previously paid for the use of said tires. In the event tubes in service on running wheels are lost, * * * they shall be paid for by the Operator at Goodrich List Prices then in effect less 50%. * * * In the event new and unused tubes are lost or stolen * * * Operator will pay for the same at Goodrich List Prices."

If a bus is sold which is equipped with Goodrich tires, the Operator will purchase the latter at List Prices then in effect "less any amount previously paid for use of said tires."

The Operator agrees to save the Goodrich Company harmless against all claims arising out of the use and possession of the tires and, in the event of default in payment according to the contract terms, or impairment of the Operator's credit, or if the buses should become subject to a lien without the consent of the Supplier, or title to the tires be threatened by attachment, etc., "or should a receiver be appointed for Operator, then * * * Supplier shall have the right to take possession of and remove from service all tires furnished hereunder * * * and/or terminate this agreement without advance notice except as to any sum or sums which may be due from one party to the other."

Payment for the use of the tires is on a mileage basis according to schedule, and the duration of the contract is until July 31, 1936, when it shall expire unless previously renewed. In the paragraph having to do with that, the following occurs: "If this contract is not renewed, Operator will purchase all tires furnished by Supplier hereunder, including those on the wheels of buses, those known as spare tires, tires in the course of repair, and tires in storage in Operator's garages, and will pay for said tires within thirty days after the expiration of this agreement at Goodrich List Prices then in effect less any amount previously paid for the use of said tires. Should this agreement be renewed, all mileage accumulated after such renewal shall be paid for at the rate fixed by such renewal agreement."

Provision is made that the Operator may *purchase* from the Supplier other rubber products manufactured by it or its subsidiaries "as listed on the attached Supplementary Agreement, Operator shall sign said Supplementary Agreement in the space provided therein."

The agreement of September 7, 1933, embodied a new paragraph 10 having to do with the basis of compensation, the mileage records, and the rates, and the change of base rates in proportion to the change in the Goodrich List Prices. There are attached such prices in effect August 1, 1933.

That of December 12, 1935, explained the assignment of the original contract by the B. F. Goodrich Rubber Company to this petitioner, and paragraph 10 was further recast in respects not now material, the rates being tabulated, and it is stated that they should be subject to adjustment on January 1, 1937, in accordance with market changes in the cost of rubber and spot cotton.

There was also included a provision covering termination by the Operator prior to the extended expiration date, whereby the Operator agreed to reimburse the Supplier at the rate of $13.77 per day during the unexpired term of the agreement, and the duration date was fixed at December 31, 1940.

█ These agreements were not recorded, and they are attacked by the trustee as being in violation of section 61 of the Personal Property Law of the State of New York, Consol.Laws, c. 41, on the theory that, taken together, they constitute a contract of conditional sale, and with that position the referee agrees.

The evidence, so far as it has been submitted on this motion, is thought by the trustee to indicate that the amount paid by the Operator to the petitioner constituted the equivalent of the value of the tires within the contemplation of the said statute, which defines a conditional sale in the following language:

"§ 61. *Definitions.* In this act 'conditional sale' means (1) any contract for the sale of goods under which possession is delivered to the buyer and the property in the goods is to vest in the buyer at a subsequent time upon the payment of part or all of the price, or upon the performance of any other condition or the happening of any contingency; or (2) any contract for the bailment or leasing of goods by which the bailee or lessee contracts to pay as compensation a sum substantially equivalent to the value of the goods, and by which it is agreed that the bailee or lessee is bound to become, or has the option of becoming the owner of such goods upon full compliance with the terms of the contract.

" 'Buyer' means the person who buys or hires the goods covered by the conditional sale, or any legal successor in interest of such person. * * *

" 'Seller' means the person who sells or leases the goods covered by the conditional sale, or any legal successor in interest of such person."

The testimony is clearly to the effect that, when the tires had been in service for upwards of 33,000 miles, they were returned to the petitioner and sold by it as scrap. That would not be consistent with ownership of the tires by the bankrupt, in the absence of proof that it received credit in some form or other for the consideration received for the scrap.

The principal argument to which the trustee's brief is directed is that the sum total of the usage payments with respect to a given tire was substantially the equivalent of the value thereof and, in order to establish that conclusion, it is argued that the List Price was a purely fictitious thing and that sales to dealers, for instance, were subject to a discount therefrom; consequently it must be concluded that the amount of money which passed from the bankrupt to the petitioner, with reference to these tires, was the equivalent of what would have been charged by the Goodrich Company if the tires had been sold to the bankrupt.

■ It is necessary that the evidence should demonstrate with reasonable certainty that such was the fiscal aspect of this course of dealing, in order that the assertion may be deemed to have been established.

The trustee argues that the total payment made on a given tire must have been the equivalent of the List Price, because under that portion of the contract which deals with the sale by the Operator of any buses equipped with petitioner's tires, the Operator agrees to purchase the tires and pay for them at the List Price less any amount previously paid for their use. The argument is phrased as follows: "In other words, if the unused mileage value is equivalent to List Price less any amounts previously paid in, then the total mileage value is equal to the List Price."

This contention fails in face of the testimony that the total mileage payments on a given tire would be about 53% below the List Price, which resulted from adding the mileage payments themselves, which totaled 37% of the List Price, to the cost of maintaining the service rendered by the petitioner, which was about 16% of the List Price.

Moreover, it should be noted that so much of the contract as is involved in this contention has to do with a possible sale by the Operator of a bus equipped with Goodrich tires, in which case the Operator agrees to *purchase* the tires with which the bus is equipped.

That situation is not presented in connection with the 348 tires which are the subject of this reclamation.

The argument was introduced in order to bring this cause within those cases many of which were decided in the State courts, in which it was demonstrated that an agreement called a lease was actually a conditional sales contract, for the reason that the total of all so-called rental payments equalled the selling price (i. e., the value) of the property involved, plus the fact that, upon the completion of all such payments, the so-called lessee would become the owner of the chattel involved.

Such a contractual relation has not been brought to light by the evidence in this case.

■ The trustee points to the statement attached to the reclamation petition as proof of his argument, because in the last column of that statement in nearly every instance (bus No. 501 seems to be an exception) the difference between the "revenue earned" and the current List Price is carried out as a "balance due under the contract."

If the testimony is understood, the unpaid tire mileage in each case should have been figured at either 37% or 53% less than the difference between the List Price and the revenue or sums already paid, which tends to discredit the statement, but not to destroy the apparent nature of the contract.

It is then urged that, pursuant to paragraph 13 of the contract, upon expiration in the absence of renewal it is provided, as above quoted, that the Operator will purchase all tires; which requires that the document be construed as a contract of purchase of the tires *which are now sought to be reclaimed.*

It is difficult to follow that reasoning. If the present contract is one of purchase, there would be no reason for including the quoted language; its very presence seems to indicate the possible coming into existence of a new relation between the parties, upon the expiration of the contract.

Again, it is to be remembered that the contract did not come to its end by passage of time and consequently the tires which the petitioner now seeks to reclaim never became the subject of the Operator's undertaking to purchase.

On the argument, reference was made to that portion of the contract found in paragraph 3 which calls upon the Operator to pay any sales tax, etc., as previously quoted.

Answers to the interrogatories indicate that, beginning in November of 1936 and continuing until July 12, 1937, the Operator paid a total of $358.44 New York City Sales Tax. When the contract was entered into in 1933, there was no such tax in effect and, while that impost is generally understood to rest upon a purchaser or consumer, it is thought that the inclusion of this provision does not determine the character of the contract. Automobile tires are ordinarily the objects of purchase and sale. Their function necessarily involves exhaustion by use; and as the List Prices govern the amounts paid for use of the tires, there was nothing more incongruous in adding the sales tax in effect, to that item, than increases in the cost of manufacture due to changes in the price of rubber or cotton.

It is because of the nature of these articles that this document cannot well be construed by comparison with other contracts having to do with more or less durable chattels. It is true that there is no specific provision for the return of used tires at the expiration of any fixed term. The testimony is uncontradicted, however, that it was the practice of the Operator to return the tires to the Supplier when they had outlived their usefulness as has already been stated, and while the assumption of an obligation to pay the sales tax might ordinarily be one of the indicia of a transition of title from the Goodrich Company to the bankrupt, it is not thought to be conclusive in the light of the other terms of the contract and the nature of the articles which were supplied under it.

For reasons best known to the contracting parties, they established and maintained their relations in accordance with this agreement, and it is not seen how the rights of creditors would be adversely affected by carrying the intention of the parties into effect.

The trustee urges that the petitioner has not discharged the burden resting upon it to prove that the money paid by the bankrupt to the petitioner was not the equivalent of the value of the tires as the same was established in like dealings with other like users. A reading of the evidence suggests that the petitioner made out its prima facie case by showing that the sums paid by the bankrupt to it fell widely short of the List Price of the tires.

It is probably the fact, although the evidence does not so disclose, that volume purchasers from the Goodrich Company being consumers (not dealers) could have obtained prices as much below the List as would be represented by a 37% discount, but to construe this contract contrary to its terms, as one of conditional sale, for that reason, would be to announce a conclusion which is without basis in the record.

The evidence teaches that the Goodrich Company was really furnishing a tire service to the bankrupt rather than selling merchandise to it, and for the mutual convenience of the parties, it was expressly agreed that title to the tires should not vest in the bankrupt; if this is the true construction of the contract, it would manifestly be unjust to defeat the purpose of the parties by depriving the petitioner of its own property in the interest of general creditors.

For that reason, it is presently found impossible to agree with the conclusion of the referee, and the petition to review will be sustained.

Settle order.